**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **JENNIFER FOSTER,** ) | |
| ) | **Case No. 3:06-0843** |
| *Plaintiff*, ) | **Judge Nixon** |
| ) | **Magistrate Judge Griffin** |
| **v.** ) | |
| ) | |
| **GROUP HEALTH CARE PLAN** ) | |
| **FOR VANDERBILT UNIVERSITY,** ) | |
| **and VANDERBILT UNIVERSITY,** ) | |
| ) | |
| *Defendants*. ) | |

## MEMORANDUM ORDER

Presently pending before the Court is Plaintiff's, Jennifer Foster ("Plaintiff"or "Ms.

Foster"), Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 18), to which

Defendant has filed a Response in Opposition (Doc. No. 23-1).  Also pending before the Court is

Defendants', Group Health Care Plan for Vanderbilt University ("the Plan") and Vanderbilt

University ("Defendant"or "Vanderbilt"), Motion for Judgment on the Administrative Record

("cross-Motion") (Doc. No. 20), to which Plaintiff has filed a Response in Opposition (Doc. 24).


I.     PROCEDURAL AND FACTUAL BACKGROUND

   A.     **Procedural Background**

   Plaintiff initially filed the present action on August 31, 2006, pursuant to the Employee

Retirement Income Security Act of 1974, 29 U.S.C. § § 1001, et seq. ("ERISA"), seeking

medical benefits for a laparoscopic LAP Band surgery ("the procedure") provided for, and

-1-

denied to her, by Defendant.  (Doc. No. 1).  Plaintiff alleges that Defendant wrongfully denied

her health care benefits for the procedure, in violation of the terms of the Plan.  (Doc. No. 1 at 8).

Plaintiff further alleges that Defendant abused its discretion in interpreting the Plan's terms and,

thereby, wrongfully denied her benefits.  Id.

> **B.**    **Factual Background**
>
> > **1.**    ***The Plan and its Provisions***[1]

Jennifer Foster, whose husband was a Registered Nurse at Vanderbilt Medical Center's

burn unit, is covered in the Plan sponsored by Vanderbilt.  AR at 129, 310-11.  Vanderbilt is the

Plan Sponsor and Plan Administrator.  AR at 258.  Vanderbilt contracts with Blue Cross Blue

Shield of Tennessee ("BCBST"), which administers the claims payments under the terms of the

Plan.  AR at 258.  However, all final decisions as to coverage and eligibility rest with Vanderbilt.

Specifically, Vanderbilt has "sole and absolute discretion and authority to interpret the terms of

the Plan, resolve ambiguities and inconsistencies in the Plan, and make all decisions regarding

eligibility and/or entitlement to coverage or benefits."  AR at 312.  The Plan states that covered

services are "[t]hose [services that are] medically necessary and appropriate."  AR at 277.

Conversely, the Plan specifically excludes from coverage those services that are not determined

to be medically necessary and appropriate, or have not been authorized by the Plan.  AR at 299.

Medically necessary procedures are those that have been determined by the administrator

to be of proven value for use in the general population.  AR at 280.  Medically appropriate

procedures are those that are medically necessary and "have been determined by the medical

director of the administrator to be of value in the care of a specific member."  AR at 280.  It does

---

[1] "AR at __" refers to the Administrative Record, pages VU000001-VU000321.

-2-

not include procedures provided solely to improve a Plan Member's condition "beyond normal variations in individual development and agency, involving content measures in the absence of disease or injury." AR at 280.

The Plan further states that BCBST's Medical Management department drafts medical policies, upon which BCBST relies in order to determine whether medical procedures are medically necessary and appropriate. AR at 267. The Plan also states that "to be eligible for . . . payment, all services . . . must be provided in accordance with [BCBST's] Medical Management Policies and Procedures." AR at 283.

BCBST's Medical Policy Manual ("the Manual") states that bariatric surgery, or the use of "a laparoscopic or open procedure for the treatment of morbid obesity," must be medically necessary. AR at 149. According to the Manual, morbid obesity is a condition of persistent and uncontrollable weight gain that constitutes a present or potential threat to life. Id. Bariatric surgery is considered medically necessary "if the medical appropriateness criteria are met." Id. According to the Manual, bariatric surgery is medically appropriate if the following criteria are met:

1. The individual has a diagnosis of morbid obesity that has persisted for at least five (5) years, and is defined as either:

More than 45 kg (100 pounds) over the ideal weight or at least twice the ideal weight. (The ideal body weight can be determined from the Metropolitan Height and Weight Table.); OR

Body Mass Index ("BMI") is greater than 40kg/m2; OR

BMI is greater than or equal to 35 kg/m2 in conjunction with any of the following obesity-related co-morbidities that will reduce the individual's life expectancy:

* Coronary artery disease; or
* Type 2 diabetes mellitus; or

-3-

       * Obstructive sleep apnea; or
       * Three or more of the following cardiac risk factors:

       1. hypertension . . . ; 2. high density lipoprotein (HDL) less than 40 mg/dl; 3. low
       density lipoprotein (LDL) greater than 100 mg/dl; 4. impaired glucose tolerance
       . . . ; 5. or family history of early cardiovascular disease in first degree relative
       (myocardial infarction at fifty years of age or younger in a male relative, or at
       sixty-five years of age or younger in a female relative); AND

2. There must be documentation of medical evaluations with a history of medical/dietary
failures (e.g. low calorie diet, increased physical activity, and behavioral reinforcement).
The provider must submit the following:

Evidence that the attempt at conservative management was within two (2) years prior to
the planned surgery. An attending physician, who is managing the care and weight loss of
the individual recommends the bariatric surgery and documents the failure of
conservative management. This physician must be someone other than the operating
surgeon and his/her associates.

Documentation of the individual's willingness to comply with both the pre- and
postoperative treatment plans recommended by a licensed mental health provider.
AR at 8-9.

        **2.**     *Medical Treatment at Vanderbilt*

      According to the records she submitted to Vanderbilt for its review, Ms. Foster became a

patient of Dr. Nanette Dendy ("Dr. Dendy") at Vanderbilt's Medical Center on July 12, 2005.

AR at 45. Dr. Dendy's notes reflect that Ms. Foster weighed up to 311 pounds at the time of the

birth of her baby in March 2005 and that her pre-pregnancy weight in 2004 was 230 pounds. Id.

Her weight-related ailments included joint aches in her hips and lower back, which became more

severe when she was pregnant with her second child. Id. Ms. Foster would also become

"winded with exertion," but she experienced "no chest pain" and her blood pressure was

"excellent." AR at 45-6. Dr. Dendy assessed Ms. Foster as being "obese." Id.

      Dr. Dendy referred Ms. Foster to Vanderbilt's Center for Human Nutrition under the

treatment of Dr. Sattar Hadi ("Dr. Hadi"). AR at 46. Ms. Foster saw Dr. Hadi on July 13, 2005.

-4-

AR at 47. Dr. Hadi's notes reflect that Ms. Foster had been unable to maintain weight loss, despite multiple diets. Id. Dr. Hadi further noted that Ms. Foster did not have any chest pain, but did experience shortness of breath with exertion. Id. According to Dr. Hadi's review of Ms. Foster's symptoms, Ms. Foster complained of tiredness, weakness, back pain, joint pain and acid reflux. AR at 48. Dr. Hadi's notes further reflect that, in the five years prior to that time, Ms. Foster had gained 20 pounds. Id. Ms. Foster's weight gain during the prior year was 30 pounds. Id. In addition, Ms. Foster estimated that her weight five years prior to her visit with Dr. Hadi was 250 pounds. AR at 54. Ms. Foster estimated that her weight one year before the office visit, in July of 2005, was 240 pounds. Id.

Dr. Hadi diagnosed Ms. Foster with "severe" obesity, with a BMI of 38.8, and identified her co-morbidities as dyslipidemia and arthritis. AR at 50. Dr. Hadi concluded that Ms. Foster was considered to be at standard cardiac risk for her age and BMI. Id. Dr. Hadi concluded that weight loss surgery was a "reasonable option." Id.

On July 14, 2005, Dr. Dendy wrote a letter to Ms. Foster informing her of the results of certain blood-work and other tests. AR at 58. Dr. Dendy expressed concern about Ms. Foster's HDL and LDL cholesterol levels, and recommended that Ms. Foster begin a diet and exercise regimen in order to regulate her cholesterol. Id. Dr. Dendy also recommended that Ms. Foster begin using a cholesterol-lowering medication. Id. Dr. Dendy did not indicate that Ms. Foster was morbidly obese. Id.

On July 15, 2005, Dr. Dendy drafted a letter, addressed "To Whom It May Concern," in which she stated that Ms. Foster "has struggled with weight for many years" and was "currently obese with a BMI of 38.8." AR at 63. Her co-morbidities include "some

-5-

dyspnea on exertion." Id. According to Dr. Dendy, Ms. Foster was "otherwise very healthy." Id. Dr. Dendy stated that, in her opinion, Ms. Foster would benefit from bariatric surgery. Id.

There is a note in Ms. Foster's file dated September 12, 2005 which appears to be a recitation of Ms. Foster's medical history taken from Ms. Foster. AR at 57. This note states "Ms. Foster has been morbidly obese for about 5 years." Id. The note was not prepared by Dr. Dendy. The note does not indicate how this diagnosis of morbid obesity was reached, by whom it was reached, nor does it include any reference to her weight or BMI over that five year period. Id.

Ms. Foster was seen by Dr. Dendy on six (6) more occasions for reasons including, but not limited to, her weight.

### 3. *BCBST's Denial of Ms. Foster's Claim for the Procedure*

On or about September 2005, Ms. Foster sought a predetermination of medical necessity for the LAP Band procedure under the Plan. AR at 139. On September 6, 2005, BCBST denied the request, having determined that the procedure was not medically necessary. Id. Specifically, BCBST found that Ms. Foster's physician had not submitted information regarding her weight for the past five years and, based on the information submitted, it appeared that Ms. Foster may not have been morbidly obese until recently. AR at 24. BCBST recommended that Ms. Foster and her doctor resubmit the predetermination request with more specific information. Id.

Between December 30, 2005 and February 6, 2006, Ms. Foster resubmitted her claim for the procedure, which was reviewed by BCBST. AR at 126-129. On December 30, 2005, Ms. Foster contacted Beth Goodrich ("Ms. Goodrich"), Vanderbilt's General Surgery Predeterminations representative, via electronic mail ("email"), to notify her that she had

-6-

completed a food journal, showing her diet for approximately six months, and would be sending it to BCBST for its consideration. AR at 127, 129, 154-254. Ms. Goodrich confirmed receipt of the journal. AR at 126.

On January 16, 2006, Dr. Willie Melvin ("Dr. Melvin"), a bariatric surgeon at Vanderbilt, wrote a letter to Vanderbilt recommending Ms. Foster for the procedure. AR at 74. Dr. Melvin stated that Ms. Foster's weight was 270 pounds and her BMI was 38.8. Id. He listed her co-morbidities as morbid obesity, shortness of breath, knee pain, foot and/or ankle pain, low back pain and depression. Id. Dr. Melvin noted that he is the surgeon who would be performing Ms. Foster's surgery. Id.

Over the next few weeks, Ms. Foster and Ms. Goodrich continued to communicate via email about the status of her appeal with BCBST. By February 6, 2006, BCBST had completed its review of Ms. Foster's second request for predetermination for the procedure. AR at 129. Again, BCBST denied the request, stating that the documentation did not show that the procedure was medically necessary, as that term was defined in the Manual. Id. BCBST notified Ms. Foster of the denial on February 7, 2006. AR at 141. In addition, on February 8, 2006, Ms. Goodrich also informed Ms. Foster of BCBST's decision and encouraged her to contact Vanderbilt's Human Resources ("HR") department about appealing the decision. AR at 129.

That same day, Ms. Foster contacted Vanderbilt via email to ask for assistance in filing an appeal of BCBST's decision. AR at 129, 132. Ron Ostenfeld ("Mr. Ostenfeld"), HR Administrator for Vanderbilt, responded that the procedure Ms. Foster was requesting was "high risk and high cost." AR at 131. Mr. Ostenfeld said that Vanderbilt had reviewed and agreed

with BCBST's guidelines on coverage, but, if Ms. Foster continued to believe that BCBST's denial was in error, she could appeal the decision to Vanderbilt. AR at 132. This decision was made without review of Ms. Foster's medical records. AR at 43.

On or about February 15, 2006, BCBST received an appeal from Ms. Foster, along with additional medical evidence, which was submitted to BCBST's medical director for review. AR at 25, 76-122. This additional medical evidence consisted of Ms. Foster's medical records from her obstetricians and gynecologists from 1998 through 2005. Id. Many of these records pertained to pre- and post-natal treatment of Ms. Foster in 1998-1999, and 2004-2005. See generally, AR at 76-114. Other records related to routine gynecological exams. AR at 112, 113.

Specifically, the following records provided information about Ms. Foster's weight, height and/or BMI in the five years preceding her claim: January 13, 1998: 200 lbs., 28.47 BMI (AR at 114); January 13, 1998: 212 lbs., 30.4 BMI (AR at 96)[2]; February 11, 1999: 221 lbs., 31.7 BMI (AR at 95); March 22, 2000: 250 lbs. (AR at 90); August 16, 2002: 245 lbs., 35.1 BMI (AR at 89); and April 15, 2005: 278 lbs. (AR at 77). One record reflected an increase in Ms. Foster's weight from 242 in August 2004 to 309 in March 2005. This weight increase was in conjunction with the progression of her pregnancy. AR at 80.

Finally, on February 15, 2006, Ms. Foster submitted a letter to BCBST in which she described her daily activities, and in which she provided information regarding the LAP Band procedure. AR at 116-122.

On March 30, 2006, BCBST reviewed Ms. Foster's appeal and denied the surgery. AR at

_____

[2] The first January 13, 1998 record appears to be Ms. Foster's own medical history, as she provided it to the physician. The second January 13, 1998 record appears to be a record of the physical exam performed by the physicians.

25.  Specifically, BCBST's medical director, who had reviewed the medical records, found that there continued to be a lack of documentation that Ms. Foster had been morbidly obese for at least five years.  Id.  On April 7, 2006, BCBST informed Ms. Foster of its decision.  AR at 145. BCBST informed Ms. Foster that, after a review of all of the available information, the medical director found that there was no submitted documentation that she had been morbidly obese for at least five years.  Id.  Therefore, the procedure did not meet the medically necessary and appropriate criteria under the Plan.  Id.  Ms. Foster was told that she could submit a request for reconsideration to Vanderbilt.  Id.

### 4.    *Vanderbilt's Review of Ms. Foster's Appeal of the Denial of Coverage for the Procedure*

On April 16, 2006, Ms. Foster wrote to Jane Bruce ("Ms. Bruce") Director of HR for Vanderbilt, asking Vanderbilt to review BCBST's decision to deny her claim for the procedure and make a determination in her favor.  AR at 39-40.  Ms. Foster submitted to Vanderbilt records from Doctors Dendy and Hadi, as well as copies of the medical records and letters which BCBST had reviewed during the initial claim and subsequent appeal.  AR at 40.

Ms. Foster also submitted to Vanderbilt a self-prepared document, which purported to show her previous weights, and which, according to Ms. Foster, "prove[d] morbid obesity for [more than] five (5) years."  Id.; AR at 123-5.  In this document, Ms. Foster claimed that she was five feet, nine inches in height and that her ideal body weight was 139-153 pounds.  AR at 124. According to a chart included in the document, Ms. Foster claimed that during the years 1998-2000, 2002, and 2004-2006, her weight ranged from a minimum of 200 pounds in 1998 to a maximum of 309 pounds in 2005.  AR at 124-5.  Ms. Foster stated that she did not have medical records reflecting her weight for the years 2001 or 2003 because she did not visit a doctor during

-9-

that period of time.  AR at 125.  She also claimed that, during 1998-2005, her BMI ranged from a minimum of 29.5 in 1998 to a maximum of 45.6 in 2005.  AR at 124-5.  Ms. Foster did not provide Vanderbilt any new or additional medical records reflecting her weight or treatment for morbid obesity.  Id

On May 5, 2006, Ms. Foster again wrote to Ms. Bruce.  AR at 37-8.  On May 8, 2006, Ms. Bruce wrote to Ms. Foster and told her that she had asked the medical director for the Plan to review the materials Ms. Foster had submitted and to discuss Ms. Bruce's own review of those materials.  AR at 36.  Ms. Bruce stated that both she and the medical director agreed that, "while it substantiates in many ways your current status, [the material presented] does not contain physician monitored treatment and provider documentation of your condition of morbid obesity for at least five years."  Id.  Therefore, Vanderbilt decided to uphold BCBST's decision to deny Ms. Foster's claim.  Id.  Ms. Bruce invited Ms. Foster to provide any additional documentation for reconsideration.  Id.

On May 11, 2006, Ms. Foster wrote to Ms. Bruce, disputing the decision to uphold BCBST's denial of her claim for the surgery.  AR at 31-3.  Ms. Foster claimed that the medical records she had submitted to BCBST, and, later, to Vanderbilt, incorrectly listed her height as five feet, ten inches tall.  AR at 31.  Ms. Foster now claimed that she was five feet, six and a half inches tall without shoes on.  Id.  Rounding her height to five feet, seven inches, Ms. Foster claimed that her current BMI was 43.7 and that her BMI numbers for the years 1998-2006 were higher as well.  Id.  Again, numbers for the years 2001 and 2003 were not listed.  Id.

Ms. Foster also reiterated that she had multiple ailments, including "severe arthritis, shortness of breath, no energy, back pain, knee pain, foot pain and edema post-cellulitis."  AR at

32. Ms. Foster did not provide any additional medical documentation regarding her weight.  Id.

On May 12, 2006, Dr. Dendy wrote to Ms. Bruce on behalf of Ms. Foster.  AR at 14-5. Dr. Dendy stated that she first started treating Ms. Foster in July 2005 and that Ms. Foster had been "troubled with obesity and difficulties losing weight" for the past six to seven years.  Id. Dr. Dendy also stated that Ms. Foster had weighed approximately 100 pounds over her ideal body weight over the last five years.  Id.  Dr. Dendy also stated that Ms. Foster's weight had fluctuated over the years and that it was creating several chronic medical conditions, including depression, osteoarthritis, chronic joint pain, and occasional urinary incontinence.  Id.  Dr. Dendy also stated, that as of May 11, 2006, Ms. Foster had an LDL level of 183 and HDL of 37. Id.  Her family history was significant for coronary artery disease in her father.  Id.  Dr. Dendy did not specify Ms. Foster's father's age when he suffered from this disease or whether Ms. Foster's father suffered from a myocardial infarction.  AR at 15.

On May 16, 2006, Ms. Foster again wrote to Ms. Bruce arguing that BCBST's determination had been made on the basis of incorrect height values in her medical records.  AR at 23, 30.  Ms. Foster claimed that her ideal weight was 150 pounds, but that she "ha[d] weighed more than 250 pounds for years," and, therefore, was more than 100 pounds overweight.  Id. Ms. Foster also explained that her medical records reflected inconsistent height measurements because she would often simply tell her doctors what she believed was her correct height.  Id. Ms. Foster did not provide any additional medical records or information.  Id.

On May 17, 2006, Dr. Sattar Hadi wrote to Ms. Bruce.  AR at 13.  Dr. Hadi stated that Ms. Foster qualified for bariatric surgery "[a]ccording to NIH/NHLBI[3] guidelines as well as your

---

[3] NIH stands for National Institutes of Health.  NHLBI stands for National Heart, Lung and Blood Institute.

guidelines." Id. Dr. Hadi did not state the grounds for this conclusion. Id.

Also on May 17, 2006, Ms. Foster wrote to Ms. Bruce stating that the height measurements found in her medical records were, again, incorrect. AR at 18. She claimed that her correct height was five feet, eight inches tall and that her ideal weight ranged from 136-150. Id. Ms. Foster also provided BMI numbers for the years 1998-2001, 2002, and 2004–2006. Id. These numbers ranged from 30.4 to 42.9. Id.

By May 23, 2006, Vanderbilt had completed its review of Ms. Foster's appeal. AR at 1-3. Ms. Bruce, along with Vanderbilt's Plan review committee and BCBST's medical director reviewed all of Ms. Foster's medical records. See AR 76-113. The committee and the director also reviewed Ms. Foster's food journal, Ms. Foster's own statements regarding her height, weight, and BMI, and emails between Ms. Foster and Vanderbilt representatives. AR at 1-3. Ms. Bruce explained that Vanderbilt had decided to uphold the denial because the body of documentation Ms. Foster submitted did not provide the necessary verification of a physician's diagnosis of morbid obesity persisting for a continuous and consecutive five-year period. Id. Therefore, the procedure was not medically necessary or appropriate and must be excluded from coverage. Id.

## II.    PENDING MOTIONS

Before the Court are Plaintiff's Motion and Defendant's cross-Motion (Docs. No. 18 and 20). In her Motion (Doc. No. 18), Ms. Foster argues that Vanderbilt's decision to deny her benefits was arbitrary and capricious because Vanderbilt, (1) "manipulated" language in the

-12-

Manual,[4] specifically, the terms "diagnosis" and "persist," to require objective medical documentation of morbid obesity for five *consecutive* years in order to be eligible for the procedure (Doc. No. 19 at 7-14); (2) ignored substantial evidence in the Administrative Record indicating that the procedure is medically appropriate and medically necessary for Ms. Foster (Id. at 15-18), and (3) made several incorrect assertions of fact because of its inherent conflict of interest (Doc. No. 24 at 8-12).

Vanderbilt moves separately for Judgment on the Administrative Record (Doc. No. 20), arguing that, (1) Vanderbilt's interpretation of the terms "diagnosis" and "persist" was reasonable (Doc. 23-1 at 6-9); (2) there is no evidence that Vanderbilt ignored evidence in the record and Vanderbilt was under no obligation to defer to Ms. Foster's treating physicians' opinions (Id. at 9-11); and (3) Vanderbilt's denial of benefits for the procedure was reasonable because Ms. Foster failed to show that it was medically necessary and appropriate under the terms of the Plan (Id. at 11-13).

## III.    SCOPE AND STANDARD OF REVIEW

### A.    Scope of Review

The parties do not dispute that the Plan is an employee benefit plan as defined by ERISA. See 29 U.S.C. § 1002(1). ERISA gives a participant or beneficiary the right to bring a civil action "to recover benefits due him under the terms of his plan, to enforce his rights under the

---

[4] Ms. Foster originally argued that Vanderbilt relied on the Manual in error, arguing that it is not part of the ERISA plan. (Doc. No. 19 at 7). In response, Vanderbilt argued that the Manual was incorporated into the Plan by reference. (Doc. No. 23-1 at 4). However, in her Response to Defendant's cross-Motion (Doc. No. 24), Ms. Foster abandons this argument and, instead, argues that she meets the criteria set forth in the Manual. Thus, the Court finds Vanderbilt was not unreasonable in relying on criteria contained in the Manual to determine Ms. Foster's eligibility for benefits.

-13-

terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The Court may only consider evidence presented to the claims administrator and contained in the Administrative Record at the time of the final denial of benefits. See Wilkins v. Baptist Healthcare Sys. Inc., 150 F.3d 609, 617-20 (6th Cir. 1998).

### B.    The Arbitrary and Capricious Standard of Review Applies

A denial of ERISA benefits by a plan administrator will be reviewed *de novo* unless the language of the plan grants the administrator discretionary authority to determine benefit eligibility and construe the terms of the plan. Wuch v. Quantum Chemical Corp., 26 F.3d 1368, 1372-73 (6th Cir. 1994) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). Thus, a court must first examine the plan to determine if there is a clear grant of the required discretionary authority. Wuch, 26 F.3d at 1373. Where a plan clearly grants the administrator "full discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan," the administrator's decision will be upheld unless it is arbitrary and capricious. Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997).

In the instant case, Vanderbilt argues that the language found in the Plan confers such discretion, making application of the arbitrary and capricious standard appropriate. (Doc. No. 21 at 16). Ms. Foster does not contest that Vanderbilt has such discretion (Doc. No. 19 at 3, 5), or that the arbitrary and capricious standard should apply (Id. at 6). Rather, Ms. Foster argues that Vanderbilt's role as both the insurer and the administrator, which makes the eligibility determinations under the Plan, creates a conflict of interest. (Doc. 19 at 3). Particularly, Ms. Foster argues that Vanderbilt's profit-making role lies in perpetual conflict with its fiduciary

-14-

role. (Doc. No. 19 at 4). For this reason, Ms. Foster urges the Court to apply a heightened "strict scrutiny" to Vanderbilt's review and denial of Ms. Foster's claim. (Id. at 6).

In the instant case, the Court finds that the Plan grants Vanderbilt express discretion to interpret and administer the Plan, such that the arbitrary and capricious standard of review applies. The Plan states that Vanderbilt has "sole and absolute discretion and authority to interpret the terms of the Plan, resolve ambiguities and inconsistencies in the Plan, and make all decisions regarding eligibility and/or entitlement to coverage or benefits." AR at 312. Thus, the Court finds that this language provides Vanderbilt with the required discretion to interpret the Plan's terms, making the arbitrary and capricious standard of review appropriate. Smith, 129 F.3d at 863.

The Court further finds that if a plan gives discretion to an administrator who is operating under a conflict of interest, then that conflict must be considered as a factor in determining whether the administrator's decision was arbitrary and capricious. See Miller v. Metro. Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991) (quoting Bruch, 489 U.S. at 956-57)). The Court acknowledges that an administrator who both funds and administers a plan is considered to be acting under an actual and readily apparent conflict of interest, not just a potential conflict, if it receives a direct financial benefit from the denial of benefits. Killian v. Healthsource Providence Adm'rs, Inc., 152 F.3d 514, 520 (6th Cir. 1998). However, despite Ms. Foster's argument to the contrary, the Court is not aware of any supporting authority for the assertion that an inherent conflict of interest changes the standard of review to be applied by this Court, or any other court in the Sixth Circuit. See McCartha v. Nat'l City Corp., 419 F.3d 437, 442-43 (6th Cir. 2005) (noting that the Sixth Circuit has "rejected the notion that the conflict of interest inherent in a

-15-

self-funded and self-administered plan alters the standard of review."). Thus, the Court will apply the arbitrary and capricious standard of review, but will, nonetheless, consider Vanderbilt's conflict of interest as one factor in deciding whether Vanderbilt's review and denial of Ms. Foster's claim for benefits was arbitrary and capricious.

## IV. DISCUSSION

A plan administrator's decision to deny benefits is not arbitrary and capricious if "it is rational in light of the plan's provisions," and it is "possible to offer a reasoned explanation, based on the evidence, for a particular outcome . . . ." Williams v. Int'l Paper Co., 22 F.3d 706, 712 (6th Cir. 2000) (quoting Daniel v. Eaton Corp., 389 F.2d 263, 267 (6th Cir. 1988)). Applying the arbitrary and capricious standard in the context of this case means that Vanderbilt's decision will be upheld if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1990).

### A. Vanderbilt's Interpretation of the Terms of the Plan and Manual was Reasonable

Ms. Foster first asserts that she is eligible for benefits for the procedure under the plain language of the Plan and Manual. (Doc No. 24 at 2-8). Therefore, Ms. Foster argues that Vanderbilt misconstrues language in the Plan and the Manual to deny her benefits. Id. Vanderbilt responds that their interpretation of language in the Plan and Manual is reasonable. (Doc. No. 23-1 at 6).

#### 1. *Contract Ambiguity and the Rule of Contra Preferentum*

Ms. Foster contends that the doctrine of *contra preferentum*, a rule of contracts

-16-

requiring contract ambiguity to be resolved against the drafter, should be applied in her favor. (Doc. No. 24 at 2-8). Defendant argues that the doctrine does not apply in ERISA plans being reviewed under the arbitrary and capricious standard. (Doc. No. 23-1 at 2).

While the Sixth Circuit has not directly addressed the application of *contra preferentum* to the arbitrary and capricious standard of review, the Circuit has strongly indicated that they favor the position articulated by the Defendant. See <u>Mitchell v. Dialysis Clinic, Inc.</u>, 18 Fed. Appx. 349, 2002 WL 1006291 (6th Cir. 2001) (discussing ERISA cases that appear to apply the rule of *contra proferentum* and stating: "We do not believe that through [language from those cases] this Circuit has established a rule of interpretation that would completely contradict the deference paid to an administrator's decision."). Other district courts, in ruling that the doctrine does not apply to cases in which a court is reviewing a decision under the arbitrary and capricious standard, have recognized that the Sixth Circuit now "seems poised" to hold that the application of the doctrine is "limited to those occasions in which [the] court reviews an ERISA plan *de novo*." See <u>Nagengast v. Crow, Chizek & Co., LLP</u>, No. 1:05-cv-533, 2006 WL 958575, at *5 (W.D. Mich. Apr. 10, 2006); <u>Muse v. Central States</u>, 227 F.Supp 873, 878-9 (S.D. Ohio 2002). "A rule to the contrary would be inconsistent with the plan administrator's discretion." <u>Nagengast</u>, 2006 WL 958575 at *5.

In the instant case, this Court adopts the reasoning of the district courts in <u>Nagengast</u> and <u>Muse</u>, in light of the fact that the Sixth Circuit has not directly addressed the application of the *contra preferentum* doctrine to ERISA cases being reviewed under the arbitrary and capricious standard. Thus, since the Court is applying an arbitrary and capricious standard of review herein, the Court concludes that the *contra preferentum* doctrine does not apply and rejects Ms.

-17-

Foster's claims to the contrary.

### 2.    *Vanderbilt's Interpretation of the Terms "Diagnosis"[5] and "Persist"*

Ms. Foster argues that she is eligible for benefits under the Plan because she currently has a diagnosis of morbid obesity and claims that she has been morbidly obese, as defined by the Plan, for at least five years.  Vanderbilt has denied Ms. Foster benefits for the procedure, requiring that a diagnosis of morbid obesity be verified or established by medial records and, further, that morbid obesity persist for five *continuous* and *consecutive* years.  Thus, the issues are Vanderbilt's interpretation of (1) the term "diagnosis" as requiring medical documentation, and (2) the term "persist" as requiring a condition, specifically, morbid obesity, to continue consecutively for the required five year period.

"In interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of its language, as it would be construed by an ordinary person."  Shelby County Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Fund, 203 F.3d 926, 934 (6th Cir. 2000) (citation omitted).

Here, the Plan states that, to be a covered service, a procedure must be both "medically necessary" and "medically appropriate."  AR at 277.  The Manual describing medical necessity and appropriateness for a LAP Band procedure states that a LAP Band candidate must present a "diagnosis of morbid obesity that has persisted for at least five (5) years."  AR at 8-9.

The definition of the term diagnosis is "1 : the art or act of identifying a disease from its

---

[5] Plaintiff argues that Vanderbilt unreasonably interpreted the terms of the Plan and Manual to require that a diagnosis of morbid obesity be demonstrated by medical record documentation.  (Doc. Nos. 19 and 24).  However, Plaintiff does not specify which term Vanderbilt allegedly misinterpreted.  The Court's use of the term "diagnosis" addresses Plaintiff's claim that Vanderbilt misinterpreted the plan to require "contemporaneous medical record documentation" in its entirety.

-18-

signs and symptoms . . . 3a : investigation or analysis of the cause or nature of a condition, situation or problem, b : a statement or conclusion concerning the nature or cause of some phenomenon." Webster's New Collegiate Dictionary 313 (8th ed. 1975). The definition of persist is: "2 : to remain unchanged or fixed in a specified character, condition, or position." Id. at 855.

In the instant case, the Court finds that it was not unreasonable for Vanderbilt to require that Ms. Foster present a medical diagnosis, in the form of medical record documentation, of her morbid obesity. Further, given the requirement under the Plan that a diagnosis of morbid obesity persist for five years, it was not unreasonable for Vanderbilt to require such medical record documentation for five consecutive years. While the Court recognizes Ms. Foster's argument to be that the language in the Manual does not explicitly require medical documentation of a diagnosis for five consecutive years, the Court finds that the sole issue before it is whether it was reasonable for Vanderbilt to make such an interpretation. Thus, given the respective definitions of the terms "diagnosis" and "persist," the Court finds that it was not unreasonable for Vanderbilt to interpret the phrase in the Manual, a "diagnosis of morbid obesity that has persisted for at least five (5) years," as a requirement that Ms. Foster present documentation of a persistent morbidly obese condition lasting for five *consecutive* years.

### B. Vanderbilt's Decision that Ms. Foster did not Demonstrate Persistent Morbid Obesity was Reasonable

Ms. Foster argues that it was unreasonable for Vanderbilt to deny her benefits, despite a lack of contemporaneous medical documentation, because letters from two doctors,[6] Doctors

---

[6] In her Motion, Ms. Foster contends that the letter written by Dr. Melvin indicates that the procedure is medically necessary. (Doc. No. 19 at 17). However, Ms. Foster concedes that Dr. Melvin may be biased because he will be paid for performing the surgery. Id. In her Response to Defendant's Cross-Motion, Ms. Foster does not

-19-

Dendy and Hadi, indicate she meets the criteria under the Plan. (Doc. 19 at 15-17). Thus, Ms. Foster argues that even if she did not have proof of five consecutive years of morbid obesity, these letters indicate that she was morbidly obese and Vanderbilt should have been persuaded by them. In response, Vanderbilt argues Ms. Foster does not meet the definition of morbidly obese as defined by the Manual. (Doc. No. 23-1 at 9). Vanderbilt further argues that they are not obligated to afford any particular weight to Ms. Foster's treating physicians, Doctors Dendy and Hadi. Id.

ERISA requires that a plan administrator conduct a full and fair review of all evidence, including the opinions of treating physicians. See 29 U.S.C. § 1133. However, ERISA does not require plan administrators to accord special deference to the opinions of treating physicians, particularly where there is credible, reliable evidence that conflicts with the treating physicians' opinions. See Black & Decker Disab. Plan v. Nord, 538 U.S. 822, 824-5 (2003).

In the Manual, "morbid obesity" is defined as being either "more than 45 kg (100 pounds) over the ideal weight or at least twice the ideal weight as determined by the Metropolitan Height and Weight Table or a BMI of greater than 40kg/ms." AR at 8. Morbid obesity also may be defined as having a BMI that is greater than or equal to 35kg/m2 along with any of the following comorbidities: coronary artery disease, Type 2 diabetes mellitus, or obstructive sleep apnea; or any of the following three comorbidities: hypertension, high density lipoprotein (HDL) less than 40 mg/dl, low density lipoprotein (LDL) greater than 40 mg/dl, impaired glucose tolerance, or a family history of early cardiovascular disease in a first degree relative. AR at 8-9.

_____

offer Dr. Melvin's letter in support of her position. (Doc. No. 24). Furthermore, Dr. Melvin's letter does not indicate that Ms. Foster was morbidly obese, as that term is defined in the Plan. AR at 74-5.

While it is clear that both Doctors Dendy and Hadi recommended Ms. Foster for the procedure,[7] the Court finds that the letters do not indicate that Ms. Foster meets the definition of morbid obesity contained in the Manual. For instance, Dr. Dendy's May 2006 letter states that Ms. Foster has weighed approximately more than 100 pounds over her ideal weight for five years. However, the medical records provided by Ms. Foster do not support this conclusion, particularly since there are no records from 2001 or 2003. Nor do the records reflect the presence of three or more of the following co-morbities: hypertension, abnormally low HDL, abnormally high LDL, impaired glucose tolerance, or a family history of early cardiovascular disease. While Dr. Dendy indicates that Ms. Foster had a low HDL and high LDL, she does not clarify whether the family history of coronary artery disease was a myocardial infarction before the age of fifty, as required by the Plan. The records further indicate that Ms. Foster had none of the co-morbidities which, along with a BMI of 35 kg/ms, would satisfy the terms of the Plan. Specifically, the records reflect no coronary artery disease, diabetes, or obstructive sleep apnea. For these reasons, the Court finds it was not unreasonable for Vanderbilt to accord little weight to Doctors Dendy and Hadi's letters where the evidence does not support these doctors' conclusions. See Black & Decker Disab., 538 U.S. at 834.

This Court previously found in the above section that Plaintiff must demonstrate five

---

[7] In May 2005, Dr. Hadi wrote: "According to NIH/NHLBI guidelines, as well as your guidelines she does indeed qualify for bariatric surgery and meets the criteria based on her BMI and comorbid conditions." AR at 13.

In July 2005, Dr. Dendy wrote, in relevant part: "This is a very pleasant 32-year-old female who has struggled with her weight for many years. She is currently considered obese with a BMI of 38.8. Her comorbidities include some dyspnea on exertion . . . In my opinion, this is considered [a] medical necessity to improve not only her quality of life but also to improve her overall health now and in the near future." AR at 63.

In May 2006, Dr. Dendy wrote: "Over the past five years, she has weighted [sic] approximately greater than 100 pounds more than her ideal body weight . . . She has an LDL of 183 and HDL that is low at 37. Her family history is significant for coronary artery disease in her father." AR at 14-5.

-21-

years of consecutive morbid obesity with documentation. Even with these letters, which do not support a diagnosis of morbid obesity, Ms. Foster cannot present documentation of five years of consecutive morbid obesity. It is uncontested that Ms. Foster did not present any medical records indicating her weight or BMI from the years 2001 and 2003. (Doc. Nos. 21 at 19, 19 at 12). Thus, in light of the above findings, Vanderbilt's denial was reasonable.

### C. Vanderbilt did not Abuse its Discretion due to a Conflict of Interest

In support of her argument that Vanderbilt was influenced by its "substantial bias," Ms. Foster argues that Vanderbilt mis-characterized facts from her medical records in order to deny her benefits. (Doc. No. 24 at 8). In addition, Ms. Foster points to the fact that Vanderbilt conceded that the procedure is "high cost" and she alleges this "high cost" influenced their decision. (Id. at 11).

Where there is "significant evidence" that a plan administrator based its decision on the costs associated with a procedure, or was otherwise motivated by self-interest, a court may find the decision to be an abuse of discretion. See Peruzzi v. Summit Medical Plan, 137 F.3d 431, 433 (6th Cir. 1998). Otherwise, where review of the record reveals no such significant evidence, the court cannot find an abuse of discretion. See id.

After a review of the record, the Court finds that Vanderbilt's denial of benefits was not motivated by a conflict of interest, nor based on the cost of the procedure or any other self-interest. The Court is cognizant that if Vanderbilt based its decision on erroneous facts and/or an incomplete review of Ms. Foster's medical evidence, then such a finding would be relevant to demonstrating a conflict of interest. However, the Court finds that none of the four examples of conflict of interest proffered by Ms. Foster show that Vanderbilt based its decision on wrong

information, performed an incomplete review of the record, was motivated by the cost of the procedure, or otherwise abused its discretion. Rather, based on a review of the entire administrative record, Vanderbilt found that Ms. Foster did not provide sufficient documentation to show persistent morbid obesity for five continuous and consecutive years. None of the four examples of conflict of interest cited in Ms. Foster's brief would have changed the fact that Ms. Foster lacked documentation of persistent morbid obesity for five years.

Further, even though Vanderbilt conceded that the procedure was "high cost," the record indicates that the procedure would be performed by Vanderbilt and, therefore, Vanderbilt itself would be compensated for the cost. AR at 74-5. Thus, the Court cannot find that this constitutes "significant evidence" that Vanderbilt based its decision on the cost of the procedure.

After a review of the record, the Court finds that there is not "significant evidence" showing Vanderbilt was improperly influenced by any inherent conflict of interest.


V.    CONCLUSION

As set forth above, the Court finds that Defendant's interpretation of the terms "diagnosis" and "persist" to require documentation of morbid obesity persisting for five consecutive years was reasonable. The Court further finds that Defendant's decision to deny Plaintiff benefits was rational in light of the plan's provision and was based on substantial evidence in the record. Accordingly, Defendant's Motion for Judgment on the Administrative Record is **GRANTED**. Thus, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.

It is so ORDERED.

-23-

Entered this the _____5th_____ day of _____July_____, 2007.




JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT